*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

UNPUBLISHED
December 22, 2020

Plaintiff-Appellee,

v

No. 348311
Berrien Circuit Court

ANTWAN TAMON MIMS,

LC No. 2018-001197-FC

Defendant-Appellant.

Before: RONAYNE KRAUSE, P.J., and MARKEY and BORRELLO, JJ.

PER CURIAM.

In this case arising from the shooting deaths of Michael Johnson and Cortez Miller, defendant, Antwan Tamon Mims, appeals by right his jury convictions of two counts of first-degree premeditated murder, MCL 750.316(1)(a); two counts of carrying or possessing a firearm during the commission of a felony (felony-firearm), MCL 750.227b(1); and carrying or possessing a firearm when ineligible to do so (felon-in-possession), MCL 750.224f. The trial court sentenced Mims as a fourth offense habitual offender, MCL 769.12, to serve two years in prison for each felony-firearm conviction, followed by concurrent sentences of life in prison without the possibility of parole for each murder conviction and 76 months to 240 months in prison for his felon-in-possession conviction. For the reasons set forth in this opinion, we affirm defendant's convictions and sentences.

## I. BACKGROUND

The shooting deaths of Miller and Johnson occurred in the early morning hours on March 25, 2018, at a home located at 996 Lavette in Benton Harbor, Michigan. Benton Harbor High School had won the state basketball championship the night before, and many people were celebrating inside 996 Lavette, in the home's yard, and along the street. Officers who had earlier responded to a large party down the street were nearby when the shooting occurred, but had to run rather than drive to the scene of the shooting because of the congested traffic.

At trial, evidence was introduced that Johnson and Miller went to 996 Lavette and socialized with others shortly before 3:00 a.m. in the morning. There was testimony that Mims ran up to Johnson as he was leaving the home and shot him in the back of the head. After Johnson

fell to the bottom of the steps leading into the house, Mims stood over Johnson and again shot him in the head. Mims then turned to Miller, who—testimony showed—was already outside when the shooting began. Mims shot Miller twice in the back: once through his arm and once through his torso. Mims also fired a shot into Miller's head. After shooting both men, Mims walked through the crowd and went home. He then fled the state and was apprehended some months later in Georgia.

At trial, Mims testified on his own behalf. He claimed that Johnson and Miller had been harassing him for weeks and that he feared they might harm him when they showed up at 996 Lavette. According to Mims, both Johnson and Miller were armed. He stated that Miller started the altercation when he drew a weapon and fired at Mims. Mims claimed that he returned fire in self-defense. According to Mims's version of events, Johnson and Miller essentially trapped him at the party. There was conflicting testimony as to whether Johnson and Miller had a reputation for being armed, and there was some suggestion that guns may have been removed from their bodies after the shooting by witnesses.

Mims testimony was rebutted by the prosecutor who presented evidence suggesting that neither Johnson nor Miller were armed on the night at issue. Investigators testified there was no physical evidence that Johnson or Miller fired any shots in the home. The investigators, however, did find five shell casings that were associated with the five shots that Mims admitted to firing. There were also witnesses whose testimonies suggested that Mims was not provoked.

After the close of all the proofs, the jury rejected Mims's claim of self-defense and found him guilty as charged. Mims now raises several claims of error on appeals in this Court.

## II. SHACKLING

### A. STANDARDS OF REVIEW

We first address Mims's claim that the trial court deprived him of a fair trial when it granted the sheriff's request to have him shackled during trial. This Court reviews a trial court's decision whether to shackle a defendant for an abuse of discretion. See *People v Payne*, 285 Mich App 181, 186; 774 NW2d 714 (2009). A trial court abuses its discretion when its decision falls outside the range of reasonable and principled outcomes. *People v Rose*, 289 Mich App 499, 524; 808 NW2d 301 (2010).

### B. ANALYSIS

Every defendant has a due-process right to be presumed innocent, which requires that the jury determine guilt "solely on the basis of the evidence introduced at trial rather than on official suspicion, indictment, continued custody, or other circumstances not adduced as proof at trial." *Id*. at 517 (quotation marks and citation omitted). Because visible shackles might have a significant effect on the jury, a defendant generally has the right to appear at trial without restraints. See *Illinois v Allen*, 397 US 337, 344; 90 S Ct 1057; 25 L Ed 2d 353 (1970). Nevertheless, it is "well-established in this and other jurisdictions that a defendant may be shackled . . . on a finding supported by record evidence that this is necessary to prevent escape, injury to persons in the courtroom or to maintain order." *People v Dunn*, 446 Mich 409, 425; 521 NW2d 255 (1994).

On the first day of trial, the trial court held a hearing on the sheriff's request to have Mims shackled during trial. Detective Lieutenant Gregory Sanders testified at the hearing and noted Mims's extensive criminal history, which included a conviction of felony assault with a dangerous weapon. Federal officers also arrested Mims for possessing cocaine and a firearm; Mims pleaded guilty to a charge and served 11 years in prison. He was released in February 2016 and was still on supervised release when he committed the offenses at issue.

Detective Sanders reminded the court that Mims fled the state and took extreme measures to avoid apprehension. He stated that they were also concerned because of an incident at the jail. He stated that while Mims was being prepared for transport he came into contact with a witness who was to testify at his trial and repeatedly told the other inmate "to do the right thing." Detective Sanders took that to mean that Mims was telling the witness not to cooperate. He also described an incident when an inmate passed a note to a victim's father, Brian Miller, in which it was written that Mims wanted Brian to lie. It appeared to Detective Sanders that Mims was trying to influence people who had been subpoenaed to testify against him. Detective Sanders also opined that the factors which the department considers when assessing risk during apprehension would place Mims at a "very high" risk. The department had Mims housed by himself because of the nature of the offense, Mims's history of violence, and the extremes taken to elude arrest. The department also ordered that Mims be handcuffed or shackled at all times when not in a cell. For that reason, if the court did not shackle Mims, he stated that the department would assign more deputies to the courtroom.

After hearing the evidence, the trial court determined that it would be appropriate to shackle Mims's legs during trial. The court recognized that Mims was on trial for two very serious offenses and that he had been convicted of two previous assaultive crimes. He also had a conviction of fleeing and eluding, which—along with the assaultive crimes—was the "most relevant," and he was still on supervised release when he shot and killed Johnson and Miller. The court further recalled that Mims had become clearly agitated at one hearing, although he had not repeated that behavior since, and he had tried to influence at least one witness. The court indicated that it was considering the fact that Mims fled and appeared to be a strong man.

In making its decision, the court stated that it did not find sufficient basis to have Mims *visibly* shackled. But it did determine that it would be appropriate to have Mims shackled by his feet. The court explained that the defendant's table was completely wood, so the shackles would not be visible to the jury during trial, and the jury would be excused before Mims would be moved. The court found that this compromise reduced the need for additional deputies in the courtroom, and it felt that the potential negative effects of shackling would not be "worse than having even more deputies circling around him in the course of this trial." Accordingly, the trial court found that the limited use of shackles was appropriate to prevent escape, to prevent problems in the courtroom, and to ensure an orderly trial.

In reaching its decision, the trial court relied on the record evidence showing that Mims had a significant criminal record, which included convictions involving physical violence, and fleeing and eluding. The record also showed that Mims had immediately fled after shooting Johnson and Miller, and took measures to avoid apprehension. The nature of the crimes at issue were also very serious. Under the prosecution's theory of the case, Mims executed two people for no apparent reason and did so in front of numerous witnesses; Mims further did so while on

supervised release from federal prison and while ineligible to possess a firearm. The trial court also witnessed Mims engage in an incident in court and heard evidence that Mims had to tried to influence other witnesses. This evidence established a plausible basis for concluding that Mims posed a flight risk or might be disruptive in court. The trial court reasonably balanced that risk against Mims's right to be free of shackles and determined that the best course of action was to use leg restraints, which would not be visible to the jury. Accordingly, the trial court's exercise of discretion fell within the range of reasonable and principled outcomes. See *Rose*, 289 Mich App at 524.

Even assuming that the trial court abused its discretion by ordering Mims to be shackled, the trial court's decision would not warrant any relief. Mims had the burden to demonstrate that the trial court's decision prejudiced his trial. When the jury is unable to see the restraints, there is ordinarily no prejudice. See *Payne*, 285 Mich at 186. The trial court noted that the defendant's table fully concealed the leg restraints; moreover, the trial court had the shackles removed throughout Mims's testimony because there was no way to conceal them at the witness stand. Because there was no evidence that the jury ever saw the shackles, and Mims has not otherwise identified any prejudice that he might have suffered as a result of the restraints, we reject Mims's claim that the trial court's decision warrants a new trial. See *id*.

## III. SUPPRESSION OF STATEMENT ON AIRPLANE

### A. STANDARDS OF REVIEW

Mims's next argues that the trial court erred when it denied his motion to suppress the statements that he made to officers on the airplane ride back to Michigan after his apprehension. He claims that he did not knowingly and intelligently waive his right to remain silent. Additionally, in a brief that he submitted on his own behalf, Mims argues that he invoked his right to counsel and, for that reason, the officers should have ceased questioning him.

> This Court reviews for clear error a trial court's factual findings in a ruling on a motion to suppress evidence. A trial court's factual findings are clearly erroneous when this Court is left with a definite and firm conviction that the trial court made a mistake. The decision whether to admit evidence is within a trial court's discretion. This Court reverses it only where there has been an abuse of discretion. A trial court abuses its discretion when it selects an outcome that falls outside the range of reasonable and principled outcomes. To the extent that a trial court's ruling on a motion to suppress involves an interpretation of the law or the application of a constitutional standard to uncontested facts, our review is de novo. [*People v Clark*, 330 Mich App 392, 415; 948 NW2d 604 (2019) (quotation marks and citation omitted).]

### B. ANALYSIS

To protect a defendant's right to remain silent, an officer must inform the defendant in clear and unequivocal terms that he or she has the right to remain silent and that anything he or she says can be used against him or her in court. *Id*. The officer must also advise the defendant that he or she has the right to have a lawyer present during the interrogation and that one will be appointed

for him or her if he or she cannot afford a lawyer. *Id*. at 415-416. A statement can only be admitted against a defendant at trial if the interrogating officers provided the required warnings and the defendant voluntarily, knowingly, and intelligently waived his or her rights. *Id*. at 416. Additionally, a defendant's assertion of the right to counsel is a per se invocation of the right to remain silent. *Id*. As such, once a defendant asserts the right to counsel, any interrogation must cease until counsel has been made available to the defendant. *Id*. The prosecution bears the burden to demonstrate by a preponderance of the evidence that the defendant's waiver of the right to remain silent was valid. See *People v Daoud*, 462 Mich 621, 634; 614 NW2d 152 (2000).

After Mims was apprehended in Georgia, he was flown back to Michigan in a small plane. One of the law enforcement officers on the flight to Michigan with Mims, Detective Sergeant Michael Sites, testified that he had an informal conversation with Mims for the first hour of the flight. He stated that he eventually told Mims that he wanted to talk about the night in question and Mims responded by stating, " 'Well, you know, my attorney told me not to talk to you.' " Detective Sites said that he told Mims that he understood, and Mims then proceeded to say something to the "effect" that he wanted to get his "side out." Detective Sites agreed, but said that he needed to "read you this first and then we can go from there." He then read Mims his rights from a card. Mims told him that he understood and signed the card. The prosecutor then played a portion of the recording made during the flight that included the advice of rights.

The recording was difficult to hear because of the noise from the small airplane's engines. Nevertheless, one can hear Detective Sites read Mims his rights over the noise of the airplane's engine. One can also faintly hear Mims agree that he understood his rights when Detective Sites asked him if did. One can also hear Detective Sites ask Mims to acknowledge his rights by signing where he made the "x" on the card.

Detective Sites testified that Mims at no point stated that he did not want to talk or that he wanted a lawyer. Mims also never asked Detective Sites to stop talking. Instead, Mims made it clear that he wanted the officers to know his side of the story.

Mims, by contrast, testified that he mentioned that his lawyer told him not to speak to them after Detective Sites handed him the card with his rights on it. Mims stated that he read the card and signed it, but he said that because of the airplane engine noise, he did not hear a word that Detective Sites said. He also denied that Detective Sites asked him if he understood his rights as he had read them—he said Detective Sites merely asked whether he understood the rights that were printed on the card. He stated that Detective Sites never asked him if he *waived* those rights. Mims felt that his signature was just an acknowledgment that he understood the rights listed on the card and was not a waiver of his right to remain silent.

At the close of proofs, the trial court stated it heard Detective Sites read Mims his rights on the recording and heard Mims say, "yeah," when Detective Sites asked Mims if he understood those rights. The trial court also noted that Mims admitted that he read the card and signed it. On the basis of the testimony and evidence, the trial court found that Detective Sites informed Mims of his rights and that Mims knowingly and voluntarily waived his rights. The trial court stated that Mims repeatedly asserted in the video that he wanted to get his story out, and that was what he did. The trial court also remarked that the statement that Mims made about his attorney was not an expression that he did not want to speak with the officers; rather, it was the opposite. The court

determined that it was "completely appropriate" for the officer to continue questioning Mims at that point. For those reasons, it denied the motion to suppress.

Although Mims and Detective Sites differed as to when Mims mentioned that a lawyer had advised him not to speak to the officers, whether he made that comment before or after he was advised of his rights was immaterial. A request for a lawyer must be unequivocal. *Davis v United States*, 512 US 452, 457; 114 S Ct 2350; 129 L Ed 2d 362 (1994). "[I]f a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect might be invoking the right to counsel, our precedents do not require the cessation of questioning." *Id*. at 459, as quoted in *People v Tierney*, 266 Mich App 687, 711; 703 NW2d 204 (2005). Here, the record reveals that Mims did not make an unequivocal demand for a lawyer. Mims's statement about the advice that he had been given not only gave rise to an inference that Mims wanted to speak with the officers without a lawyer, it was also evidence that he understood the full import of what he was doing when he chose to speak with Detective Sites. See *Clark*, 330 Mich App at 415-416. As such, the trial court did not err when it determined that Mims did not unequivocally assert his right to counsel and that it was appropriate for Detective Sites to continue questioning Mims. See *Tierney*, 266 Mich App at 711.

The trial court also did not clearly err when it found that Detective Sites read Mims his rights and inquired whether Mims understood those rights. See *Clark*, 330 Mich App at 415-416. Detective Sites testified that he read Mims his rights and that Mims agreed that he understood them. The audio recording—although inaudible for much of the interview—captured Detective Sites's recitation of Mims's rights and appears to capture Mims affirming that he understood. Indeed, Mims has conceded that Detective Sites read him his rights and that he voluntarily chose to speak with the detective; he merely suggests that he did not fully appreciate the import of his decision. Examining the record as a whole, Mims's claim that he did not hear Detective Sites and did not understand what he was doing is not persuasive. A defendant can waive his or her right to remain silent without understanding the ramifications and consequences of choosing to waive the rights that the officer otherwise properly explained. See *Daoud*, 462 Mich at 636. The record evidence supported the trial court's finding that Mims chose to waive his right to remain silent and that his decision was knowingly, intelligently, and voluntarily made. See *Clark*, 330 Mich App at 416.

On this record, we conclude that the trial court's findings were not clearly erroneous and the trial court did not abuse its discretion when it denied Mims's motion to suppress the statements that he made on the flight back to Michigan. See *id*. at 415-416.

## IV. SUPPRESS VIDEO OF STATEMENT

### A. STANDARDS OF REVIEW

We next address Mims's argument that the trial court erred when it allowed the jury to see the video of the statement that he made at the jail after his return from Georgia. He claims that the trial court should only have played the audio because the video depicted him with handcuffs and a belly chain. Although Mims challenged the admission of the video, he did not specifically challenge the admission on constitutional grounds, and the trial court decided the matter under the

-6-

rules of evidence. Therefore, he has not properly preserved this claim of error to the extent that it involves a constitutional challenge. See *People v Aldrich*, 246 Mich App 101, 116; 631 NW2d 67 (2001).

This Court reviews de novo whether the trial court properly applied constitutional law. See *Rose*, 289 Mich App at 505. This Court also reviews de novo whether the trial court properly interpreted and applied the rules of evidence. See *People v McFarlane*, 325 Mich App 507, 517; 926 NW2d 339 (2018). This Court reviews a trial court's evidentiary decision for an abuse of discretion. *People v Yost*, 278 Mich App 341, 353;749 NW2d 753 (2008). A trial court abuses its discretion when its decision falls outside the range of reasonable and principled outcomes. *Id*. Because Mims's constitutional claim of error is unpreserved, this Court's review is limited to determining whether the admission of the video amounted to plain error that violated Mims's substantial rights. See *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999). To avoid forfeiture under the plain error test, Mims must show that the trial court erred, that the error was plain or obvious, and that the error affected the outcome of the lower court proceeding. See *id*.

Otherwise relevant evidence may be excluded if "its probative value is substantially outweighed by the danger of unfair prejudice." MRE 403; see also *People v Roper*, 286 Mich App 77, 106; 777 NW2d 483 (2009).

## B. ANALYSIS

Mims concedes on appeal that the video was relevant and would otherwise be admissible were it not for the fact that he appeared in handcuffs. See MRE 401 (defining relevant evidence to be "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence"); MRE 402 (providing that relevant evidence is generally admissible). Nevertheless, he maintains that the prejudice occasioned by his depiction in handcuffs outweighed the probative value of the video. See MRE 403. For that reason, he maintains the trial court should have limited the evidence to the audio alone.

The video at issue was relatively brief—less than 15 minutes—and Mims appeared relaxed and agreeable throughout. The officer treated Mims with respect, and they spoke in conversational tones. The jury could clearly see that Mims had been handcuffed to a belly chain, which implicated official suspicion, but the jury was well aware that it was not by " 'choice or happenstance' " that Mims was present in the interrogation room. See *Rose*, 289 Mich App at 517, quoting *Holbrook v Flynn*, 475 US 560, 567; 106 S Ct 1340; 89 L Ed 2d 525 (1986). Moreover, the prejudicial effect was mitigated in several ways: the appearance was on video, not in person; Mims appeared before the jury throughout the lengthy trial without any visible restraints, which included his live testimony; and the jury might make reasonable inferences about the use of restraints at that time that did not implicate the presumption of innocence. See *Gates v Zant*, 863 F2d 1492, 1502 (CA 11, 1989) (stating that the video did not tend to negate the presumption of innocence because the image was on a screen rather than in person, the jury might infer that it was standard procedure under the circumstances rather than drawing impermissible inferences, and the defendant appeared

without restraints throughout the trial).[1]  The trial court further limited any prejudice by instructing the jury that it must decide guilt on the basis of evidence and not "sympathy or prejudice", and that it must begin "with the presumption that the defendant is innocent.  See *People v Mahone*, 294 Mich App 208, 212; 816 NW2d 436 (2011) ("Jurors are presumed to follow their instructions, and it is presumed that instructions cure most errors."); see also *Roper*, 286 Mich App at 106 (holding that a jury instruction adequately safeguarded the defendant's rights).

Moreover, the video was highly probative of Mims's intent and was useful for evaluating his claim that he acted in self-defense.  Although the trial court focused on whether Mims demonstrated a crawling motion during the interview because the disparity in that description was at issue during the preliminary examination, a review of the video shows that Mims used body language, gestures, and even positioned himself in the interrogation room in ways that clarified his description of events.  In some instances, his gestures and positioning lent considerable gravity to his statements.  Mims's audible description of the events was also not particularly articulate, and his body language and motions were helpful in providing context.

When the probative value of the evidence is considered against the danger that the jury might have used it for an improper purpose, it cannot be said that the danger of unfair prejudice substantially outweighed the evidence's probative value for a proper purpose under MRE 403.  See *People v Mardlin*, 487 Mich 609, 627; 790 NW2d 607 (2010) (stating that the danger of unfair prejudice must be determined by weighing the value of the evidence for a proper purpose against the danger that the jury might consider an improper purpose).  Under these circumstances, the trial court did not abuse its discretion when it determined that the video was admissible despite the danger.  See *Yost*, 278 Mich App at 353.

Mims also maintains that the video was inherently prejudicial because he appeared in restraints.  As previously discussed, it is generally improper to have a criminal defendant appear at trial in visible restraints.  See *Rose*, 289 Mich App at 517-518.  However, the claim at issue does not involve Mims's appearance at trial—it involves his depiction in a short video while wearing handcuffs.  Although the Supreme Court of the United States has held that it can be a violation of due process to have a defendant appear in shackles, it has framed that constitutional limitation as one involving the defendant's appearance at trial.  For example, the Court has held that, when otherwise unjustified, the use of visible restraints *at trial* violates due process because it undermines the presumption of innocence.  See *Deck v Missouri*, 544 US 622, 631; 125 S Ct 2007; 161 L Ed 2d 953 (2005).  The use of restraints also interferes with the defendant's ability to participate in his or her own defense *at trial*.  *Id*.  Finally, the use of shackles undermines the dignity and decorum of the *trial* itself:

> [J]udges must seek to maintain a judicial process that is a dignified process.  The courtroom's formal dignity, which includes the respectful treatment of defendants, reflects the importance of the matter at issue, guilt or innocence, and the gravity with which Americans consider any deprivation of an individual's liberty through criminal punishment.  And it reflects a seriousness of purpose that

---

[1] Opinions of lower federal courts and foreign jurisdictions are not binding on this Court, but they may be persuasive.  See *People v Patton*, 325 Mich App 425, 434 n 1; 925 NW2d 901 (2018).

helps to explain the judicial system's power to inspire the confidence and to affect the behavior of a general public whose demands for justice our courts seek to serve. The routine use of shackles in the presence of juries would undermine these symbolic yet concrete objectives. [*Id*.]

The Supreme Court has reached similar conclusions with other procedures that implicate the presumption of innocence at trial. See *Holbrook*, 475 US at 567-572 (concluding that the deployment of extra deputies in the courtroom is not inherently prejudicial and holding that, when a courtroom procedure is not inherently prejudicial, courts must determine whether the procedure was proper on a case-by-case basis); *Estelle v Williams*, 425 US 501, 503-505; 96 S Ct 1691; 48 L Ed 2d 126 (1976) (discussing the requirements of due process as applied to trial practices that might impair the presumption of innocence, such as requiring a defendant to appear in prison attire). However, courts have not extended these precedents to conclude that evidence that includes a depiction of a defendant in prison garb or restraints is inherently prejudicial. See, e.g., *Gates*, 863 F2d at 1501-1502 (treating the admission of evidence depicting the defendant in handcuffs as though it were a brief viewing of the defendant in handcuffs at trial for purposes of determining whether the admission prejudiced the defendant); *Hosch v Alabama*, 155 So 3d 1048, 1120 (Ala App, 2013) (stating that the due process rule involving restraints has not been extended to video evidence); *Tennessee v Taylor*, 240 SW3d 789, 796-797 (Tenn, 2007) (discussing authorities that have rejected the contention that videos of the defendant in prison garb are inherently prejudicial and corrupt the presumption of innocence).

Because the viewing of evidence depicting a defendant in prison garb or restraints does not involve a trial practice that undermines the presumption of innocence, does not interfere with a defendant's ability to participate in his or her own defense, and does not implicate the decorum of the trial itself, see *Deck*, 544 US at 631, the trial court cannot be said to have plainly erred by failing to apply the precedents involving inherently prejudicial trial procedures to its determination involving the admission of the video evidence, see *Carines*, 460 Mich at 763. Additionally, whatever prejudice might have been occasioned by the depiction of Mims with handcuffs was minimal and was not of significant duration or importance in the whole of the trial to negate the presumption of innocence. See *Gates*, 863 F2d at 1502. Finally, the trial court safeguarded Mims's rights by instructing the jury on the presumption of innocence. See *Roper*, 286 Mich App at 106. Under these circumstances, Mims has not established plain error that prejudiced his trial. See *Carines*, 460 Mich at 763. Accordingly, defendant is not entitled to relief on this issue.


V. SUFFICIENCY OF THE EVIDENCE

A. STANDARDS OF REVIEW

Next, defendant argues that the prosecution failed to present sufficient evidence to prove beyond a reasonable doubt that he premeditated the killings of Johnson and Miller. He also argues that the prosecution failed to present sufficient evidence to overcome his claim that he acted in self-defense.

This Court reviews a challenge to the sufficiency of the evidence by examining the record evidence de novo in the light most favorable to the prosecution to determine whether a rational trier of fact could have found that the essential elements of the crime were proved beyond a reasonable doubt. This Court must resolve all conflicts in the evidence in favor of the prosecution. [*People v McFarlane*, 325 Mich App 507, 513; 926 NW2d 339 (2018) (quotation marks and citations omitted).]

## B. ANALYSIS

First-degree premeditated murder is second-degree murder with the added elements that it must be done willfully, deliberately, and with premeditation. *People v Carter*, 395 Mich 434, 437; 236 NW2d 500 (1975); MCL 750.316(1). Willfully means that is done "with design to take the life of the victim…" *People v Potter*, 5 Mich 1, 7 (1858). As such, the prosecutor may not establish first-degree murder by presenting evidence that the defendant intended to inflict great bodily harm or created a very high risk of death or great bodily harm and knew that death or great bodily harm was the probable result. See *People v Dykhouse*, 418 Mich 488, 495; 345 NW2d 150 (1984). Consequently, first-degree premeditated murder is the intentional killing of a human with premeditation and deliberation. *People v Oros*, 502 Mich 229, 240; 917 NW2d 559 (2018).

Our Supreme Court has stated that a murder suddenly conceived after adequate provocation cannot properly be called deliberate. *People v Scott*, 6 Mich 287, 294 (1859). "But whenever murder is intentionally committed without serious provocation, and under circumstances which do not reasonably account for such an excitement of passion as naturally deprives men of deliberation, common experience teaches us that such an act is wanton, and its perpetrator responsible for it, as in other cases of cold-blooded crime." *Id*.; see also *Oros*, 502 Mich at 246, quoting *People v Holmes*, 111 Mich 364, 372; 69 NW 501 (1896), quoting *Scott*, 6 Mich at 294. Whether an act was deliberate is a matter of plain common sense in which a "jury can seldom be at a loss to determine" because in most cases no "sane man acts without some cause for his action" and the jury will be able to determine whether it was a "sudden heat or not." *Scott*, 6 Mich at 294.

This Court has also discussed the proper distinction between deliberation and premeditation within the meaning of MCL 750.316:

> To premeditate is to think about beforehand; to deliberate is to measure and evaluate the major facets of a choice or problem. As a number of courts have pointed out, premeditation and deliberation characterize a thought process undisturbed by hot blood. While the minimum time necessary to exercise this process is incapable of exact determination, the interval between initial thought and ultimate action should be long enough to afford a reasonable man time to subject the nature of his response to a "second look." [*People v Morrin*, 31 Mich App 301, 329-330; 187 NW2d 434 (1971), rejected not in relevant part by *People v Reese*, 491 Mich 127, 147-148; 815 NW2d 85 (2012) (stating that then Judge LEVIN's discussion of imperfect self-defense was obiter dictum); cf. *Oros*, 502 Mich at 241-242 (citing the decision in *Morrin* with approval).]

Our Supreme Court endorsed this "second look" approach to determining the sufficiency of the evidence for premeditation and deliberation. See *People v Tilley*, 405 Mich 38, 44-45; 273 NW2d 471 (1979). In *Tilley*, our Supreme Court agreed that, although a person who acts on sudden impulse cannot be said to have acted deliberately, the fact that there was a short span of time to deliberate and premeditate does not preclude a conviction of first-degree premeditated murder. *Id*. at 44-45. There need only be an interval between the initial thought and ultimate action sufficient to afford a reasonable person time to subject the nature of his or her response to a second look. *Id*. at 45. If the defendant had such an opportunity, a reasonable jury could find that the defendant acted with deliberation and premeditation. *Id*. at 46; see also *Oros*, 502 Mich at 242-243.

Here, there was overwhelming evidence that Mims intended to kill Johnson and Miller. Mims himself stated that he had a handgun on his person, that he drew his weapon and, according to his version of events, he only fired after Miller first attacked him. He then fired to kill. Indeed, he stated that he shot Johnson a second time—after Johnson had fallen and despite the fact that he thought he had shot Johnson in the head—because he thought Johnson was still moving. Likewise, Mims stated that he ran after Miller, whom Mims thought was trying to retrieve a gun. The evidence showed that Mims shot Miller three times: twice from behind and once directly into his head. The only dispute was whether Mims acted in self-defense, and, if not, whether he premeditated the killings.

An otherwise intentional homicide may be justified when the defendant honestly and reasonably believes that his or her life is in imminent danger, or that he or she is in danger of serious bodily harm, and that it is necessary to exercise deadly force to prevent the harm. See *People v Riddle*, 467 Mich 116, 126-127; 649 NW2d 30 (2002); see also MCL 780.972. Once a defendant presents some evidence that he or she acted in self-defense, the prosecution bears the burden of disproving self-defense beyond a reasonable doubt. *Riddle*, 467 Mich at 155. In this case, the prosecution presented sufficient evidence to permit a reasonable jury to reject Mims's version of events and find beyond a reasonable doubt that he did not act in self-defense.

At trial, Davin Young testified that he was an eyewitness to the shooting and that it did not involve any provocation by Johnson or Miller. Young stated that Miller was not even in the house when the shooting occurred. Rather, Young and Johnson were sitting on the couch when Johnson asked Young to go outside to speak with him. Young stated that, as he and Johnson walked out the front door, Mims ran up, reached out and pointed a firearm directly at the back side of Johnson's head, and shot him; Young opined that Johnson never saw it coming and was dead before he fell outside.

Young's testimony alone—if believed by the jury—was sufficient to establish that Mims shot Johnson without any provocation or justification whatsoever. From that, a reasonable jury could find beyond a reasonable doubt that Mims did not reasonably believe that he needed to use deadly force to defend himself. See *id*. A reasonable jury hearing Young's testimony could also infer that any aggressive actions by Miller were in response to having seen Mims execute Johnson on the steps. Hence, a reasonable jury could conclude that Mims was the initial aggressor with regard to Miller and was, therefore, not acting in self-defense. See *People v Guajardo*, 300 Mich App 26, 35; 832 NW2d 409 (2013) (stating that an initial aggressor cannot claim self-defense).

Mims argued at trial that Young's testimony could not be believed because he was a police informant. Whether Young was worthy of belief was a matter for the jury alone; and this Court will not second-guess the jury's credibility determination. See *People v Bailey*, 310 Mich App 703, 714; 873 NW2d 855 (2015) (stating that it is for the jury to decide the weight and credibility to be afforded the evidence and warning that the Court would not interfere with the jury's role as the sole judge of the facts). We note that the jury was made fully aware that Young was a police informant, and just after denying that he had a substance abuse problem, he admitted on the stand that he might test positive for marijuana if he were to be immediately tested. Thus, the jury knew that there might be some cause to doubt the reliability of Young's testimony. Even setting aside Young's testimony, there was additional ample evidence to support the jury's decision to reject Mims's version of events.

Mims claimed that he only drew his weapon and fired at Johnson and Miller after he observed both men were armed and Miller first began to fire at him. The events occurred in front of numerous witnesses, however, not a single witness testified they saw Miller or Johnson wielding or firing a gun. Some witnesses testified to the contrary: they stated that they did not see any altercation or provocation between Johnson, Miller, or Mims. There was testimony that witnesses heard shots that they thought were from different guns, and there was testimony that could have led the jury to believe that Miller and Johnson were armed at some point. According to Mims, he moved from one side of the doorway to the other side without Miller or Johnson seeing him. At that point, Miller purportedly turned and fired several shots at the location where Mims had been located moments earlier, while Johnson was reentering the home with a weapon. Mims claimed that it was only then that he pulled his weapon. He then shot Johnson in the back of the head and pushed both Miller and Johnson through the open door. That story was so inconsistent with the physical evidence that a reasonable jury could conclude that Mims was fabricating his version of events to put himself in a better light.

Additionally, as previously discussed, the physical evidence also undermined Mims's version of events. Officers who searched the home did not find any evidence that someone other than Mims fired any shots in the house—there were no shell casings and no signs of bullet strikes inside the home other than two .25 caliber shots that evidence established came from outside near the road and struck the terrarium. Mims maintained that the officers did a poor job of searching the home and that the shell casings from Miller's weapon may have been inadvertently moved by the crowd of spectators. When examining the evidence, this Court must consider all the inferences that can fairly be drawn from the evidence because, when evidence is relevant and admissible, "it does not matter that the evidence gives rise to multiple inferences or that an inference gives rise to further inferences." *People v Hardiman*, 466 Mich 417, 428; 646 NW2d 158 (2002). The evidence that the officers had no trouble finding the five shell casings associated with the five shots fired by Mims indicated that the reason that they did not find any other shell casings in the home or around the bodies had nothing to do with the crowd or poor police investigation; instead, a reasonable jury could find that the officers found no shell casings that could be associated with Miller or Johnson because neither man fired a weapon. See *id*.

The jury also heard that Johnson suffered a gunshot wound to the back of the head that was inconsistent with Mims's testimony about his location at the point when he first began to shoot. The shot to Johnson's head was from back to front and went in a downward trajectory. That shot was consistent with Young's testimony, but inconsistent with Mims's claim that Johnson was

reentering the home. Additionally, the medical examiner, Dr. Theodore Brown, testified that that shot passed through Johnson's brain stem and cerebellum and was instantly fatal, which was inconsistent with Mims's claim that Johnson was still holding a gun and was trying to get back up after being struck by the first shot to his head. The evidence further suggested that Mims stood over Johnson and fired a second shot directly into Johnson's face, which was corroborated by eye witness testimony. A reasonable jury making those inferences would be justified in further inferring that Mims was not acting out of any sense that he was in imminent danger, but instead deliberately executed Johnson. See *id.* Witnesses also testified that Johnson was not entering the home when he was shot. These other witnesses stated that Johnson was in the doorway and facing outside when Mims shot and killed him. From all this evidence, a reasonable jury could reject Mims's claim that he shot and killed Johnson in self-defense. See *McFarlane*, 325 Mich App at 513.

The physical evidence similarly supported the jury's decision to reject Mims's version of events with regard to Miller. The evidence showed that Miller was shot and killed in the yard and nowhere near the doorway, even though Mims claimed that Miller was in the doorway when the shooting began. The jury heard that three shell casings associated with the shots that killed Miller were found clustered together near Miller's body. The evidence showed that Miller was shot from behind twice and once in the face. Dr. Brown testified that the shots to the back of Miller's arm and torso went through Miller, yet Miller was found facing up. This evidence permitted an inference that Mims walked up to Miller and shot him while he was facing away from Mims— either because he was fleeing or did not know that Mims was approaching. The jury could then find that Mims fired the third shot into Miller's head. See *Hardiman*, 466 Mich at 428. The totality of those circumstances was so inconsistent with Mims's version that a reasonable jury could readily reject Mims's claim that he only acted because he feared imminent death or serious bodily injury at Miller's hands. Consequently, even without Young's testimony—which was entirely consistent with the physical evidence and the other witnesses' testimony—the prosecutor presented sufficient evidence from which a reasonable jury could reject Mims's claim of self-defense beyond a reasonable doubt. See *McFarlane*, 325 Mich App at 513.

This same evidence supported an inference that Mims had the requisite state of mind to support a first-degree murder conviction—that is, that he acted deliberately and with premeditation. See, *Id.* In proving an actor's state of mind, the jury may rely on circumstantial evidence and the reasonable inferences arising from that evidence; indeed, minimal circumstantial evidence is sufficient to establish that a defendant had the intent to kill and proceeded with deliberation and premeditation. *People v Unger*, 278 Mich App 210, 223; 749 NW2d 272 (2008). The prosecution may establish premeditation and deliberation through evidence of the parties' prior relationship, the defendant's actions before the killing, the circumstances regarding the killing itself, and the defendant's conduct after the killing. *People v Schollaert*, 194 Mich App 158, 170; 486 NW2d 312 (1992).

As previously discussed, Mims ran up to Johnson as Johnson was leaving the home and shot him in the rear side of his head. In order to run up and shoot Johnson in that way, Mims had to ready his weapon, contemplate his approach, and then proceed to run up to Johnson. The evidence that he ran up to Johnson while Johnson was turned away from him, reached over Young, and shot Johnson demonstrated a level of planning, which suggests that he acted deliberately and with premeditation. See *Tilley*, 405 Mich at 44-45. Additionally, the evidence showed that, after

Mims shot Johnson, Johnson fell outside and came to rest by the last step. Dr. Brown testified that Johnson was also shot through the nose and that the bullet traveled through his brain to the back of his head. That evidence tended to suggest that Mims stood over Johnson as he lay prone and shot him in the head a second time, which was also consistent with witness testimony. The extra effort that Mims took to fire the second shot and thereby ensure that Johnson was dead encompassed time to rethink his actions. See *id*. Mims then turned his attention to Miller.

The evidence showed that Mims shot Miller twice from behind and once to the face. A reasonable jury could find that Mims first fired at Miller when Miller was facing away and that he fired the third and last shot after Miller fell. See *Hardiman*, 466 Mich at 428. Again, the evidence that Mims approached Miller and shot him in the head indicated that Mims acted deliberately and with a significant opportunity to take a second look at what he was doing. See *Tilley*, 405 Mich at 44-45. Consequently, there was sufficient evidence from which a reasonable jury could find beyond a reasonable doubt that Mims acted deliberately and with premeditation. See *McFarlane*, 325 Mich App at 513. Accordingly, defendant is not entitled to relief on this issue.

## VI. MANSLAUGHTER INSTRUCTION

### A. STANDARDS OF REVIEW

Mims also argues on appeal that the trial court erred when it refused to instruct the jury on the necessarily included lesser offense of manslaughter. This Court reviews de novo whether the trial court properly instructed the jury. See *People v Martin*, 271 Mich App 280, 337; 721 NW2d 815 (2006). This Court reviews the instructions as a whole to determine whether "the instructions adequately protected the defendant's rights by fairly presenting to the jury the issues to be tried." *Id*. at 337-338 (quotation marks and citation omitted).

### B. ANALYSIS

A defendant is entitled to have the jury instructed on a necessarily included lesser offense of a charged offense if a rational view of the evidence would support such an instruction. See *People v Mendoza*, 468 Mich 527, 533; 664 NW2d 685 (2003). Both involuntary and voluntary manslaughter are necessarily included lesser offenses of murder. *Id*. at 541. As such, Mims would have been entitled to an instruction on manslaughter, if a rational view of the evidence supported that instruction. See *id*. at 533. On appeal, Mims refers to involuntary manslaughter, but also refers to adequate provocation, which is an element of voluntary manslaughter. As such, it is unclear which manslaughter instruction he is actually arguing the trial court should have given.

Voluntary manslaughter is the intentional killing of another while under the influence of passion produced by an adequate provocation. *Id*. at 535. The provocation necessary to mitigate a homicide from murder to voluntary manslaughter is that which would cause a reasonable person to lose control and act out of passion rather than reason. See *Roper*, 286 Mich App at 87. Additionally, there must have been no lapse of time within which a reasonable person would have controlled his passions. *Id*.

During the discussions on jury instructions, defense counsel asked for an instruction on the necessarily included lesser offense of involuntary manslaughter. He stated that the instruction was warranted because the "level of excitement was high." The prosecutor argued in response that

there was no evidence that Mims ever lost control. The trial court indicated that the only evidence tending to show provocation—before Miller allegedly pulled a handgun—was the evidence that Miller and Johnson exchanged "stink eyes" with each other and Johnson deliberately bumped Mims. The court determined that was inadequate to constitute provocation as a matter of law. Accordingly, it denied the requested instruction.

At trial, Mims testified about incidents of harassment that Johnson and Miller purportedly subjected him to. However, those incidents occurred before the night at issue and after a reasonable person would have had more than sufficient time to compose themselves. As such, even if they were the kinds of incidents that would cause a reasonable person to lose control, they would not warrant an involuntary manslaughter instruction. See *id*. Likewise, there was little testimony that Miller or Johnson engaged in acts that were of a type that would tend to cause a reasonable person to lose control and act out of passion. The same is true of the evidence of provocation on the night at issue.

According to Mims, the only actions that Johnson or Miller did to provoke him was show up to the house when he felt it was improper for them to do so, to stiff-arm him, and to say, "I got you." Such actions are not generally understood to cause a reasonable person to fly into an uncontrollable rage. As this Court has stated, " '[n]ot every hot-tempered individual who flies into a rage at the slightest insult can claim manslaughter.' " *Roper*, 286 Mich App 89, quoting *People v Pouncey*, 437 Mich 382, 389; 471 NW2d 346 (1991). Because no reasonable jury could find that a person would lose control over such trivial actions, the trial court correctly determined that an voluntary manslaughter instruction was not warranted. See *Pouncey*, 437 Mich at 390 (stating that the trial court may exclude provocation when no reasonable jury could find that the provocation was adequate). But even assuming that these actions might have established a question of fact for the jury, Mims removed that issue from the jury when he testified that none of these events actually caused him to lose control. Mims testified that he showed great restraint and was prepared to let Miller and Johnson leave without retaliating against them for their lack of respect; the only reason he pulled his gun was in self-defense. Consequently, the trial court did not err when it denied Mims's request for an instruction on voluntary manslaughter. See *id*. at 390-391 (noting that the defendant himself stated that he was not angry and holding that the evidence was inadequate to submit the matter to the jury).

Similarly, there was no basis for instructing the jury on involuntary manslaughter, which is—in relevant part—the "unintentional killing of another, without malice." See *Mendoza*, 468 Mich at 536. There was no evidence that the killings of either Johnson or Miller were unintentional. See *id*. at 545. Witnesses testified that Mims walked up to both victims and shot them "execution style," and Mims testified that he intentionally shot and killed both Johnson and Miller, albeit in claimed self-defense.

Even if this Court were to conclude that the trial court should have given a manslaughter instruction, as the prosecutor correctly notes on appeal, that error would not warrant relief. The jury was instructed on the necessarily included lesser offense of second-degree murder for both Miller and Johnson. The jury rejected the lesser offenses for both men. Consequently, any error was harmless. See *People v Gillis*, 474 Mich 105, 140 n 18; 712 NW2d 419 (2006).

## VII.  MOTION FOR A NEW TRIAL

### A.  STANDARDS OF REVIEW

We next address Mims's argument that the trial court erred when it denied his motion for a new trial.  On appeal, he only challenges whether the trial court should have granted his motion premised on improper questions by the prosecutor.  This Court reviews a trial court's decision on a motion for a new trial for an abuse of discretion.  See *People v Rao*, 491 Mich 271, 279; 815 NW2d 105 (2012).  A trial court abuses its discretion when it selects an outcome that falls outside the range of principled outcomes.  *Id*.  Whether a prosecutor engaged in misconduct that denied the defendant a fair trial is a question of law that this Court reviews de novo.  See *People v Ackerman*, 257 Mich App 434, 448; 669 NW2d 818 (2003).

### B.  ANALYSIS

During his cross-examination of Mims, the prosecutor asked Mims if he thought that Detective Sites was lying, and Mims stated that he did think that Detective Sites was lying about what Mims told him on the plane.  The prosecutor also asked Mims if another witness was lying when she said that she was in the house during the events at issue, and Mims said that she was lying too.  Thereafter, the trial court intervened on its own initiative, and the prosecutor did not ask Mims again whether he thought another witness had lied.

The trial court found, and we concur, that it was improper for the prosecutor to ask Mims whether he thought the other witnesses were lying because Mims's opinion of their credibility was not relevant. See *People v Buckey*, 424 Mich 1, 17; 378 NW2d 432 (1985). Having found the prosecutor's questions constituted error, we must next determine whether the prosecutor's error was harmless.

Review of the record leads us to conclude that the prosecutor's questions did not amount to improper bolstering of the witnesses as the improper questions did not involve asking witnesses to opine about Mims's guilt, and were—as the prosecutor noted on appeal—quite limited in scope. Under the circumstances, the prejudice was minimal.  See *id*. (noting the same factors and concluding that the Court was unable to discern how the defendant was harmed by the questions). Additionally, any prejudice could readily have been cured by a jury instruction, which the defense did not request. See *People v Holt*, 207 Mich App 113, 122; 523 NW2d 856 (1994).  Consequently, the trial court did not abuse its discretion when it denied Mims's motion for a new trial premised on that claim of error.  See *Rao*, 491 Mich at 279.

## VIII.  INEFFECTIVE ASSISTANCE OF COUNSEL

### A.  STANDARDS OF REVIEW

In his Standard 4 brief,[2] Mims argues that defense counsel provided ineffective assistance and that, but for his errors, there was a reasonable probability that the outcome would have been different.  Specifically, he maintains that defense counsel failed to lay a proper foundation for the introduction of an inconsistent statement that could have been used to impeach a witness, Keyoma Campbell.  He also claims that defense counsel should have objected to the admission of the autopsy photos on the ground that they were gruesome.

This Court reviews de novo as a question of constitutional law whether a particular act or omission fell below an objective standard of reasonableness under prevailing professional norms and prejudiced the defendant's trial.  *People v Gioglio (On Remand)*, 296 Mich App 12, 19-20; 815 NW2d 589 (2012), remanded for resentencing 493 Mich 864 (2012).  Because the trial court did not hold an evidentiary hearing on this claim of error, there are no factual findings to which this Court must defer and this Court's review is for mistakes that are apparent on the record alone.  See *id*. at 20.  However, if a defendant has preserved a request to remand, we can and must consider any additional evidence supplied by the defendant for the limited purpose of considering whether, upon plenary review, such a remand would be appropriate.  *People v Moore*, 493 Mich 933, 933; 825 NW2d 580 (2013).

In order to establish his claim of ineffective assistance of counsel, Mims must show that his trial counsel's failure to impeach the witness and object to the admission of the photos fell below an objective standard of reasonableness under prevailing professional norms.  See *Gioglio*, 296 Mich App at 22.  To overcome the presumption that defense counsel provided effective assistance, Mims must show that no reasonable lawyer in defense counsel's position would have refrained from impeaching the witness or would have failed to object to the photos.  See *id*. at 22-23.  He must also demonstrate that the act or omission that fell below an objective standard of reasonableness prejudiced his trial.  See *id*. at 23.  An act or omission prejudices a defendant's trial when there is a reasonable probability that, but for the act or omission, the outcome would have been different.  *Id*.

### B.  ANALYSIS

Although Campbell testified at trial, her testimony was not particularly helpful to the prosecution.  Campbell reluctantly admitted that she saw the shooter and denied knowing who the shooter was; she also repeatedly emphasized how she did not get a good look at what was happening.  When cross-examining Campbell, defense counsel got Campbell to admit that she told officers a different version of events when she spoke to them shortly after the events at issue, eventually admitting she lied to them.  Trial counsel also elicited from Campbell that she only told the "real" story three weeks before trial.  Defense counsel also elicited testimony from Campbell

---

[2] A Standard 4 brief is a supplemental brief filed *in propria persona* by a criminal defendant under Standard 4 of Michigan Supreme Court Administrative Order 2004-6, 471 Mich c, cii (2004). *People v Lampley*, 327 Mich App 104, 132 n 2; 933 NW2d 314 (2019).

in which she admitted that she visited a prisoner at the jail and told him that Johnson tried to shoot, but got shot up.

Generally, whether and how to cross-examine a witness are matters of trial strategy. See *People v Petri*, 279 Mich App 407, 413; 760 NW2d 882 (2008). In this case however, there is no question but that trial counsel's failure to inquire of Campbell whether Johnson was armed established that trial counsel's performance was so deficient that if fell below an objective standard of reasonableness. See *People v Putnam*, 309 Mich App 240, 248; 870NW2d 593 (2015). In a discussion held outside the presence of a jury, it became clear that defense counsel wanted to ask Detective Sergeant Brian Kastelic about the statement wherein Campbell told officers that Johnson was armed. The prosecutor objected on the ground that defense counsel did not ask Campbell whether she made an inconsistent statement to the officers. See MRE 613(b). Defense counsel suggested that he did question her about whether she saw Johnson with a gun. The trial court reviewed defense counsel's examination and determined that he did not ask Campbell about a statement to officers concerning whether Johnson was armed. As such, it barred defense counsel from bringing that statement out through the detective to impeach Campbell. Because it is clear on the record that defense counsel thought he had established grounds for bringing in Campbell's statement, but was mistaken, his failure to properly lay the foundation for impeaching Campbell amounts to an omission that is evident on the record. Accordingly, we next examine whether defendant suffered prejudice, such that, "but for defense counsel's errors, the result of the proceeding would have been different." *Putnam,* 309 Mich App at 248.

Because trial counsel cross-examined Campbell and exposed her credibility issues, any statement that Detective Kastelic would have related would have served only to further impeach Campbell—it would not have been substantive evidence that Johnson was actually armed. See *People v Jenkins*, 450 Mich 249, 256; 537 NW2d 828 (1995) ("The purpose of extrinsic impeachment evidence is to prove that a witness made a prior inconsistent statement-not to prove the contents of the statement."). Additionally, trial counsel elicited testimony that Campbell had told others that Johnson was armed, but she also stated that her statements to others shortly after the shooting were not true and that she was, for the most part, just relating information that she had heard on the street. Given the testimony by other fact and expert witnesses that established Mims shot and killed both Johnson and Miller under circumstances that did not appear to have been provoked or in self-defense, we cannot conclude that additional impeachment of Campbell would have altered the jury's verdict. See *Putnam*, 309 Mich App at 248.

As to the admission of the autopsy photos, we note that relevant evidence is generally admissible. MRE 402; *Roper*, 286 Mich App at 91. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." MRE 401. When considered with the other testimony and evidence, the images were highly relevant to a variety of disputed facts, such as Mims claim of self-defense and whether Mims premeditated killing Johnson and Miller.

The images were relevant as visual aids to understanding Dr. Brown's testimony. See *People v Mills*, 450 Mich 61, 72-74; 537 NW2d 909 (1995) (providing that images of a victim's injuries may be relevant to corroborate a witness's testimony). Dr. Brown opined that Johnson's injuries were inflicted at close range. Additionally, he stated that there was an injury to the side

of Johnson's head that went from front to back and proceeded downward, which permitted an inference that Johnson was shot from behind and above. The autopsy images visually depicted the evidence that supported Dr. Brown's conclusion.

The images were also relevant to establishing the relative positioning of the parties during the shooting. When considered with the evidence that Johnson was 6'2" tall, the images gave rise to an inference that Johnson was standing on the steps leading up to the house and facing away from the shooter when he was shot.

The images were relevant as well to assessing the credibility of both Young and Mims. The images were consistent with Young's testimony that Mims ran up, reached over Young's shoulder, and shot Johnson in the back of his head as Johnson was leaving the home; they were inconsistent with Mims's statement that Mims shot Johnson as Johnson was reentering the home. See *People v Layher*, 238 Mich App 573, 579-580; 607 NW2d 91 (1999) (stating that evidence implicating a witness's credibility is almost always relevant).

The images of the gunshot wound to Johnson's nose also tended to suggest that Johnson was prone when Mims inflicted that wound—that is, the images permitted an inference that Mims stood over Johnson and shot him in the face. The fact that Mims was able to stand over Johnson permitted the further inference that the shot to the nose was the second shot and, therefore, permitted an inference that Johnson was fully incapacitated when Mims stood over Johnson and shot him again. That evidence helped establish the prosecution's theory that Mims acted deliberately and with premeditation.

The same factors were involved with the images of Miller's injuries. The images established that Mims shot Miller twice from behind, which tended to show that Miller was turned away from Mims when Mims shot him. The images of the injury to Miller's head also tended to bolster the testimony that Mims ran up to Miller and fired a final shot to finish Miller off.

Taken together, the images were highly relevant to the jury's understanding of the circumstances regarding the shooting and for assessing the credibility of the witnesses' testimony. Accordingly, the evidence was relevant and admissible. See MRE 401; MRE 402. Moreover, although relevant evidence may be excluded if "its probative value is substantially outweighed by the danger of unfair prejudice," MRE 403, the fact that images at issue were gruesomeness did not itself require exclusion. See *Mills*, 450 Mich at 76. Rather, the inquiry was whether the probative value of the images was substantially outweighed by the danger of unfair prejudice. *Id*. The images did not involve such untoward detail that a reasonable juror would be unable to fairly assess their probative value—that is, there was no danger that "evidence which is minimally damaging in logic will be weighed by the jurors substantially out of proportion to its logically damaging effect." *Id*. at 75-76 (quotation marks and citation omitted). Because the images were highly relevant to several important areas of dispute, they were not excludable under MRE 403. Consequently, defense counsel cannot be faulted for failing to object to their admission on that basis. See *People v Head*, 323 Mich App 526, 539; 917 NW2d 752 (2018) (stating that defense counsel is not ineffective for failing to make a meritless motion).

Accordingly, defendant is not entitled to relief on his claims of ineffective assistance of counsel.

## IX.  SUPPRESSION OF EVIDENCE

### A.  STANDARDS OF REVIEW

Mims also argues that the police officers violated due process by failing to test the clothing of Johnson and Miller for gunshot residue, and for storing the clothing in a way that prevented him from obtaining the same evidence.  He further suggests that defense counsel was ineffective for failing to ask the trial court to instruct the jury that it could infer that the gunshot residue test would have favored Mims.  This Court reviews de novo the proper application of constitutional principles, but reviews for clear error any factual findings underlying the trial court's application of law.  See *People v Dimambro*, 318 Mich App 204, 212; 897 NW2d 233 (2016).

### B.  ANALYSIS

In order to establish a violation of due process premised on the state's failure to preserve evidence, Mims must demonstrate that the officers acted in bad faith and caused the loss of evidence that might have exonerated him.  See *People v Jones*, 301 Mich App 566, 580-581; 837 NW2d 7 (2013) (stating that the defendant bears the burden to show that the police officers intentionally suppressed the evidence or acted in bad faith); *People v Heft*, 299 Mich App 69, 79; 829 NW2d 266 (2012), lv den 495 Mich 875 (2013).  The officers investigating the deaths of Miller and Johnson had no obligation to test their clothing for gunshot reside.  See *People v Anstey*, 476 Mich 436, 461; 719 NW2d 579 (2006) (stating that officers have no obligation to develop evidence for the defense).  Even when officers develop evidence, the officers are not obligated "to preserve all material that might be of conceivable evidentiary significance in a particular prosecution."  *Arizona v Youngblood*, 488 US 51, 58; 109 S Ct 333; 102 L Ed 2d 281 (1988).

As the prosecutor correctly notes on appeal, Mims has not identified any evidence that the officers acted in bad faith to cause the loss of evidence.  Instead, Mims asserts—without any evidence to support his assertion—that the officers should not have hung the clothing out to dry in a garage.  Even assuming that hanging blood-stained clothing out to dry in a garage might not be the best way to preserve evidence on the clothing, the record suggests that the officers merely acted according to their normal practices and without any conscious effort to suppress evidence, which does not establish that the officers acted in bad faith.  See *California v Trombetta*, 467 US 479, 488; 104 S Ct 2528; 81 L Ed 2d 413 (1984) (stating that there is no due-process violation when officers act in good faith according to their normal practices); see also *People v Johnson*, 197 Mich App 362, 365; 494 NW2d 873 (1992) (stating that, in the absence of evidence of bad faith, the loss of evidence before a defense request for production does not violate due process).

Additionally, Mims has not shown that the evidence was actually lost or that it might have exonerated him.  Mims failed to establish that the officers acted in bad faith when they hung the clothing to dry in a garage or that the decision to hang the clothing resulted in the loss of potentially exonerating evidence.  See *Jones*, 301 Mich App at 580-581; *Heft*, 299 Mich App at 79.

Because the record did not support the conclusion that officers acted in bad faith, any motion by defense counsel for relief premised on a bad faith failure to preserve evidence would have been futile.  See *Head*, 323 Mich App at 539.  Accordingly, trial counsel was not ineffective for failure to have the clothing tested and defendant is not entitled to relief on this issue.

At oral argument, defendant renewed his argument for a remand to the trial court for testing of his clothing. Defendant asserted that such testing would bolster his claim of self-defense. However, in support of his motion, defendant has failed to file supporting affidavits from any experts informing this Court as to what fact in dispute testing of the evidence would prove. Furthermore, we would expect defendant's clothing to have gunpowder residue as it was never at issue as to defendant's proximity to the victims when he fired his weapon. Accordingly, in the absence of any relevant reason for the testing, and in the absence of any expert affidavit setting forth the relevancy of such testing, we again deny defendant's request for a remand.

## X. CUMULATIVE ERROR

Defendant next argues that the cumulative effect of the errors warrants a new trial, even if no one error warrants a new trial.

The cumulative-error doctrine is a doctrine that recognizes that an appellate court can reverse and remand for a new trial when the cumulative effect of several errors demonstrates that the defendant did not receive a fair trial even though no one error by itself warranted reversal. See *United States v Rivera*, 900 F2d 1462, 1470-1471 (CA 10, 1990) (en banc) (stating that the cumulative-error doctrine aggregates the prejudice from the errors found to be harmless on appeal to determine whether the errors collectively warrant reversal), cited with approval in *People v Bahoda*, 448 Mich 261, 292 n 64; 531 NW2d 659 (1995). This Court reviews a cumulative error argument by examining the *actual* errors identified on appeal to determine whether the errors cumulatively deprived defendant of a fair trial. See *People v LeBlanc*, 465 Mich 575, 591 n 12; 640 NW2d 246 (2002).

Here, the only errors were the prosecutor's improper questions to Mims and defense counsel's inadvertent failure to lay the foundation for further impeachment of Campbell. The prosecutor's questions were fleeting and caused very little prejudice. Similarly, defense counsel's omission had limited effect because he had already impeached Campbell's credibility and her testimony had little import when viewed in the context of the whole trial. As such, the cumulative effect of these errors did not affect the fairness of Mims's trial. See *Bahoda*, 448 Mich at 292 n 64. Consequently, Mims has not demonstrated that the cumulative effect of these minor errors warrants a new trial.

## XI. CONCLUSION

Because defendant has not identified any errors that warrant a new trial, we affirm.

Affirmed.

/s/ Amy Ronayne Krause
/s/ Jane E. Markey
/s/ Stephen L. Borrello